# Richmond

ALONZO FENTRESS V. COMMONWEALTH OF VIRGINIA.

January 15, 1931.

Present, Campbell, Holt, Epes, Hudgins and Browning, JJ.

*Tom E. Gilman, Jas. M. Wolcott* and *Venable, Miller, Pilcher & Parsons,* for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General,* for the Commonwealth.

EPES, J., delivered the opinion of the court.

Alonzo Fentress was indicted in the Circuit Court of Norfolk county for the murder on January 12, 1929, of E. H. Bradley. Upon his trial the jury found the defendant guilty of involuntary manslaughter and fixed his punishment at five years in the penitentiary, upon which verdict the court entered judgment.

Accepting the testimony introduced by the Commonwealth as true, it proves the following facts:

Norview and Estabrook are suburban settlements lying north of the city of Norfolk in Norfolk county. Norview has about 500 houses in it, and Estabrook about 200 houses. The road from Norview through Estabrook into Norfolk is known as the Norview road. It runs southward from Norview to Norfolk, entering Twenty-sixth street in the city of Norfolk, and consists of two concrete driveways, located one on each side of the right of way of the electric railway line leading from Norfolk to Ocean View. Persons going from Norfolk toward Norview travel the roadway lying east of the car tracks, and persons coming from Norview to Norfolk use the roadway lying west of said tracks. West of the western driveway is an open field with grass growing up to the very edge of the driveway.

E. H. Bradley, the deceased, lived in Norview, and Alonzo Fentress, the accused, lived in Norview on the west side of the Norview road, between one-fourth and one-half of a mile from where Bradley's body was found.

On the evening of January 12, 1929, between six and six-thirty o'clock, J. F. Cooke was driving south, towards Norfolk, on the western driveway of said Norview road,

and found Bradley's dead body lying west of said western driveway, at a distance variously estimated as from three to five feet from the concrete and about 300 to 400 yards north of Cordell's office in Estabrook. One leg had been broken in two or three places and was almost severed from the body, and there was a gash on his forehead. When witness Kierstead arrived between seven and seven-thirty o'clock, Bradley's body was stiff, though not entirely cold.

Two pieces of flesh and a piece of bone were found about seventy-five feet north of where the body was found, and marks on the ground and the condition of Bradley's clothing indicated that the body might have been dragged southwardly on the ground near the western edge of the concrete. A skid mark was found where an automobile wheel had left the concrete about seventy-five feet north of where the body was found, and another mark where an automobile wheel had come back on the concrete, about 135 feet south of where the body was found. Between said points, in a "kind of soft spot," bare of grass, was found the impression of an automobile tire, the impression being about six inches long, but the evidence does not show whether it was a fresh or an old track. One of the Commonwealth's witnesses testified that he positively identified said impression as having been made by a Dayton cord tire, though he admitted that there is not much difference in the track made by Dayton, Mohawk and United States tires, and that "they are pretty near alike." Except for this small space the ground along the west of the concrete was covered with grass, and showed no plain marks of automobile tracks.

A few minutes after seven o'clock Estes, a motor-cycle officer of Norfolk city, saw an automobile, with its right headlight disarranged, approaching him, coming west on Twenty-sixth street in the city of Norfolk. The right headlight of this car was bent around to the right, the front end of the right fender was bent under and the fender split

where it joined the apron, and the right cowl light was broken and hanging by the wire that conducted current to its bulb.

The point at which Estes first saw this automobile on Twenty-sixth street is about two and one-half miles from where Bradley's body was found. Automobiles coming into Norfolk from Fairmont Park, the old Ocean View boulevard, the water-works, Princess Anne county, and from Virginia Beach boulevard would normally pass where the officer first saw this car, and be going in the same direction in which this car was going.

When Estes first saw this car it was running about thirty-five miles an hour. He turned around to overtake this car, which speeded up and turned south from Twenty-sixth street into Church street. Estes drove up beside this car, recognized Fentress, the accused, as the driver of it, and ordered him to pull over to one side and stop. Fentress ran along at the same speed for approximately a second, looked around at Estes and speeded up to about forty-five miles an hour, turned to the right into Eighteenth street, increased his speed to between fifty and sixty miles an hour, ran down Eighteenth street about three blocks, and then tried to turn to the right across an open field where there was a baseball diamond. In making the turn the wheel of the car struck the curb and it turned over on its left side. This point was approximately three miles from where Bradley's body was found.

When Estes reached the capsized automobile, Fentress handed him a five gallon bottle of whiskey and asked him to hide it. This Estes refused to do, and the accused got out of the car with another five gallon bottle in one hand and a gun in the other. The accused put the gun in his pocket or holster, and struck the five gallon bottle in his hand against the other five gallon bottle which Estes had placed on the ground, breaking both bottles. Fentress

then walked away, the officer permitting him to do so, he says, with the intention of shooting him after he got some distance away, but afterwards decided not to shoot.

An examination of this car, made after it had capsized, showed that it was a six cylinder Durant car, the rear wheels of which were equipped with Dayton cord tires; that the right front fender was damaged; that the right front headlight was bent back and had two small dents in it; that the right cowl light was broken and that there was a red spot on the cowl light. However, upon a chemical analysis of this red spot, made at the request of the police officers, it was found not to be blood.

About nine o'clock that night Detectives Walker and Spencer of the Norfolk city police force went to the residence of the accused, whom they found in bed, and placed him under arrest. They found on the door knob of an inside door in the home of the accused a spot which looked like it might be blood. They asked accused to let them see his hands, and found that on one hand he had a very small cut place on the right thumb. Upon being questioned the accused told the officers that he had been sick in bed all that evening and had not been out. Dr. Sturgis, a physician, arrived while the police officers were at the home of the accused and examined the accused and advised him to stay in bed. The police officers told Fentress that they would permit him to stay at home in bed, but that they would place a man there to guard him. The accused, however, said that he preferred to go with them down to the police station and give bond, which he did.

Fentress took the witness stand in his own behalf. He testified that he did not run over or strike Bradley; that he drove home on the afternoon of January 12, 1929, between four-thirty and five o'clock, and, being sick, went to bed at once, and did not leave the house thereafter until he went with the arresting officers to give bail about nine-thirty

o'clock; and that when he went home he drove a four cylinder Durant car which he owned. He admitted that he owned the six cylinder car which was overturned on Eighteenth street in the city of Norfolk on the night of January 12th, but denied that he was in the car at the time; and further testified that about four p. m. he left his said six cylinder car, with the key in it, at a garage near his place of business to be greased and to have the oil changed, with instructions to the garage man to leave the car in front of the garage, as he expected to come or send for it.

The accused introduced a number of witnesses whose testimony, read together, was to the effect that on January 12, 1929, he was at home in bed from about four-thirty p. m. until the officers arrested him; that he drove home in a four cylinder Durant car owned by him; and that he had left said six cylinder car at the garage to be greased, and that it was standing in front of this garage at six p. m. The defendant's witness Smith, who is bookkeeper and salesman for Joynes Tire Company, testified that his company sells Dayton cord tires in Norfolk and in the year 1928 sold more than 500 such tires in the city of Norfolk.

Dr. Sturgis, who was introduced by the accused, testified that Fentress had about two-fifths of a degree of temperature when he examined him that night, and that his pulse was between eighty-five and ninety, which was somewhat quicker than he would have expected to find in view of the small degree of fever which he had.

It was also brought out on cross-examination of defendant's witness Webb, a garage man who had examined said six cylinder car after it had capsized, that from the appearance of this car it had hit something; that it looked as if the right front fender had not been washed for some time and had mud spots on it; and that these mud spots appeared to have been smeared by something that had been wiped across it.

The Commonwealth introduced no rebuttal evidence.

At the conclusion of the Commonwealth's evidence the accused moved the court to strike out all the evidence of the Commonwealth on the ground that the evidence was insufficient to support a verdict against the accused; and after verdict rendered the accused moved the court to set aside the verdict of the jury and grant him a new trial, on the ground that the verdict was contrary to the evidence and without evidence to support it, both of which motions the court overruled.

Even assuming that the evidence is sufficient to establish the fact that Bradley came to his death by means of a criminal agency, we think it clear that neither the evidence introduced by the Commonwealth nor all the evidence in the case is sufficient to prove beyond a reasonable doubt that Fentress killed Bradley. Therefore the court erred both in refusing to strike out the evidence of the Commonwealth, and in refusing to set aside the verdict of the jury and award a new trial. For this reason the judgment of the court must be reversed and the case remanded for a new trial to be had, if the Commonwealth be advised that it has other evidence sufficient to warrant it in putting the accused on trial again.

Assignments of error 3 to 7, inclusive, relate to the action of the court in admitting or refusing to exclude certain portions of the evidence of witnesses for the Commonwealth. With one unimportant exception, the correctness of the several rulings of the court complained of in these assignments of error was dependent on the then state of the evidence in this case. It is not probable that the same questions can arise upon a new trial, if such be had, and we deem it unnecessary to discuss these assignments of error.

Assignments of error 8 to 16, inclusive, relate to the action of the court in giving and refusing instructions. It

is not probable that the same questions raised by these assignments of error will arise on a new trial, if one be had, and as they present no new questions of law, we shall not pass upon or enter upon a discussion thereof.

The 17th assignment of error is to the action of the court in refusing to grant a new trial on the ground of after-discovered evidence; which, in view of what has been said above, is unnecessary to this opinion.

*Reversed.*